```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/3/12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

BRYANT PATTERSON,                              :

                  Petitioner,           :

    - against -                                  :

DAVID A. ROCK,                                 :

                 Respondent.           :

-------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
JESSE M. FURMAN**

09 Civ. 1038 (JMF) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        Petitioner Bryant Patterson ("Patterson") brings this habeas corpus proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction in Supreme Court, New York County, after a jury trial, on six counts of Assault in the First Degree; four counts of Gang Assault in the First Degree; two counts each of Assault in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree; and one count of Reckless Endangerment in the First Degree. Patterson is serving a series of concurrent sentences, the longest of which are twenty-five year determinate terms.

        Patterson asserts two claims in his petition, (ECF No. 1 ("Petition" or "Pet.")). First, Patterson contends that the evidence at trial was legally insufficient to sustain the jury's verdict. (Id. ¶ 13). Second, Patterson contends that the trial court erred in admitting evidence of uncharged crimes. (Id.). For the reasons set forth below, the Petition should be denied. Additionally, because Patterson has not made the substantial

showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

I.      Background

The evidence presented at trial would have permitted a reasonable juror to find as follows:

A.      People's Case

1.      Background

The case against Patterson arose out of a shooting at the Broadway Arcade in Manhattan ("Arcade") on March 9, 2003.  At that time, Patterson lived in Far Rockaway, Queens, and was friendly with several individuals residing in the Edgemere housing project ("Edgemere").  (T. 849-55, 1166-69, 1300-07).[1]  Among Patterson's Edgemere friends were Justin and Jeremy Wilson ("Justin" and "Jeremy"), Shamecca Williams ("Shamecca"), Daniel Price ("Price"), and Akiem Addison ("Addison").[2]  (Id.). Several members of the Edgemere Group, including Patterson and Justin, also were members of the "Bloods" youth gang.  (Id. at 924).

Edgemere is located near another housing project called Ocean View.  (Id. at 849-50).  Several Ocean View residents and their friends had been involved in a long-

_____

[1]      "T." refers to the trial transcript.  "S." refers to the transcript of Patterson's sentencing.  "Ex." refers to the exhibits annexed to the Declaration of Assistant Attorney General Leilani Rodriguez, dated January 6, 2011.  (ECF No. 23).  "Resp't's Mem." refers to the Respondent's Memorandum of Law.  (ECF No. 22).

[2]      Together with Patterson, these individuals will be referred to collectively as the "Edgemere Group."

running feud with the Edgemere Group, during which there were numerous physical altercations.  (Id. at 849-50, 871-87, 1163-64, 1297-98).  Among the individuals on the Ocean View side of the rivalry were Odolatokunbo Dawodu ("Dawodu"), Jermont Williams ("Williams"), Candice Gonzalez ("Gonzalez"), and Tamika Green ("Green").[3]

2.      The Shooting

Shortly after midnight on Sunday, March 9, 2003, the Ocean View Group went to the Arcade, which was located at 42nd Street and 8th Avenue in Manhattan.  (Id. at 888-90, 1181, 1313, 1536, 1583).  The first and second floors of the Arcade contained games; in the rear of the second floor there was a dance floor and bar.  (Id. at 262-68, 271-75).  Although security personnel at the Arcade normally searched patrons for weapons and other contraband as they entered, a larger than expected crowd that night caused security to admit some females without a search.  (Id. at 295-97, 322-28, 352-54, 988-93).  After entering the Arcade, the Ocean View Group proceeded to the dance floor area.  (Id. at 899-902).

At approximately 2 a.m., the Edgemere Group entered the Arcade and went to the dance floor.  (Id. at 766, 777).  Members of the Ocean View Group saw the Edgemere Group enter and recognized some of them.  (Id. at 902-13, 1190-92, 1320).  The Edgemere Group initially remained "bunched up" on the dance floor near the deejay's booth, while the Ocean View Group situated itself near the exit doors.  (Id. at 917-21).  Shortly thereafter, the Edgemere Group surrounded Williams while he danced

---

[3]        These individuals will be referred to collectively as the "Ocean View Group."

with Green.  (Id. at 1193-94, 1322-24).  Williams then insulted Patterson, and the two

nearly came to blows.  Williams also exchanged words with Justin and Jeremy, who

similarly appeared ready to fight.  (Id. at 1548-51).  After an Arcade security officer

approached the groups and requested that they calm down, a friend of the Ocean View

Group managed to restore the peace momentarily.  (Id. at 925-27, 994-96, 1063-65, 1106,

1328).

       Despite the lowering of tensions, the Edgemere and Ocean View groups

continued to keep an eye on one another.  (Id. at 930-33).  When members of the

Edgemere Group "thr[e]w up [gang] signs" in response to a particular song being played

by the deejay, the two groups began staring at each other menacingly.  (Id. at 1325-26,

1564-65).  Believing that someone had pushed Dawodu, Williams attempted to punch

Justin.  (Id. at 1567).  At some point, Patterson reached his hand inside his open jacket as

if reaching for a concealed gun.  (Id. at 1199-1202, 1229-1235).  Meanwhile, Justin had

pulled a gun from his waistband with his right hand and pointed it at Williams.  Williams

then turned away from Justin as he heard gunshots.  (Id. at 1567-69).  Green also heard

gunshots coming from the area of the dance floor near the deejay booth.  (Id. at 1331-35).

       Dawodu, who was dancing nearby, did not see Williams attempt to punch

Justin, nor did he realize that the first shots had been fired because the song being played

at the time incorporated the sound of gunfire.  He heard another gunshot moments later,

however, and collapsed with a bullet wound to his chest.  (Id. at 936-41, 973-74).  As he

fell he saw Justin standing over him, waving a gun in his right hand, and Shamecca and

Patterson standing next to Justin, taunting and laughing at Dawodu.  (Id. at 942-45, 951, 974).

Shortly after these shots were fired, Arcade patron Latoya Fleming saw a black man, approximately six feet tall and wearing baggy clothing, holding a gun in his left hand and waving it at the crowd.  (Id. at 1689-92).  Arcade employee Tony Davis ("Davis") similarly saw a man with a gun in his left hand.  According to Davis, the gunman was light-skinned and had "puffed out hair, with a red bandana on."  (Id. at 1784-85).  Patron Rolando Callist ("Callist"), who was shot in the wrist, saw a black man with braided hair holding a gun, but did not see the man's face.  (Id. at 1143-46, 1149, 1157).

As the crowd on the dance floor fled for the exits, the Arcade security manager directed his staff to keep all of the patrons inside the Arcade, which led to several fights between patrons and security personnel.  (Id. at 340-48).  At some point, a patron identified Justin and Jeremy as the shooters.  Arcade security consequently detained them until the police arrived.  (Id. at 347, 1004-06).  Security also detained Williams outside the Arcade.  (Id. at 416).

By the end of the incident, three members of the Ocean View Group had been shot:  Dawodu, Green, and Gonzalez.  Arcade patrons Callist, Taryn Branch ("Branch"), Christian Wannamaker ("Wannamaker"), and Franklin Santiago ("Santiago")

also had been shot, as had Arcade employee Earlon Lewis ("Lewis").  (See id. at 100-01).

Justin and Price had been stabbed.[4]  (Id. at 388-89, 392-93).

        3.      Police Investigation

At approximately 2:30 a.m. on March 9, Detective Seth Layne ("Det.

Layne") learned that shots had been fired at the Arcade.  He arrived there approximately

fifteen minutes later.  (Id. at 396-99).  When he entered the dance floor, he saw blood,

bloody clothing, and shell casings.  (Id. at 414-15).  Det. Layne then spearheaded the

police investigation of the shooting.  (Id. at 461-64).

At approximately 4:30 a.m., detectives from the Crime Scene Unit ("CSU")

began searching the Arcade and processing the crime scene.  (Id. at 513, 573).  The CSU

detectives found two deformed copper-jacketed bullets and four nine-millimeter shell

casings, but no guns.  (Id. at 530-41).  A detective and officer from the Emergency

Services Unit ("ESU") also searched the Arcade, including the air ducts suspended from

the ceiling, but did not locate any additional ballistics evidence.  (Id. at 565, 574, 592-96,

600-10, 624).  The ESU detectives further failed to discover any marks on the floors,

walls, or ceilings consistent with having been struck by a bullet.  (Id. at 568, 610).

At approximately 1:30 a.m. on March 10, officers arrested Patterson at his

home in Queens.  (Id. at 363-64).  At the time, Patterson's hair was braided toward the

---

      [4]      All of the victims survived.  Patterson does not challenge the sufficiency of the
evidence concerning the seriousness of the victims' injuries.  Accordingly, there is no need to
describe that aspect of the People's case.

front but in a loose, "Afro style toward the back."  (Id. at 369).  The arresting officers also were able to confirm that Patterson was left-handed.  (Id. at 368-69).

At approximately 7 p.m. that evening, Det. Layne and another officer interviewed Patterson, who waived his Miranda rights.  (Id. at 473-74, 481-83).  Patterson then gave a statement that he reduced to a signed writing.  In that statement, Patterson explained that Shamecca had entered the Arcade with a "gun on her hip," but gave it to him once inside.  The Edgemere Group then saw Williams and the Ocean View Group on the dance floor, where Justin and Williams began "arguing with each other" while the Edgemere Group was singing along to a song by the artist 50 Cent.  Someone "came in between them," however, and broke up the argument.  (Id. at 644-47).

According to Patterson, when the deejay played another song by 50 Cent, Justin and Williams began to argue again.  Williams then "swung at Justin" with an object in his hand that Patterson thought was a gun.  Patterson claimed that, in response, he "pulled out [his] gun and shot once in the air."  Hearing the gunshot, the Arcade patrons "fell to the floor," at which time Patterson "put the gun in [his] sleeve."  Patterson stated that he then saw Jeremy (not Justin) fire a shot in the direction of Williams, after which Patterson quickly left the Arcade and took a taxi home.  (Id. at 647-48).

Patterson concluded his statement by noting:

> I'm sorry for the people who got hurt and for the families that are suffering.  I just want to let you know that I am not the man who shot you but I am so sorry that you got hurt and if I can change the hands of time I would.  If I could take your place I would.

7

> When I went home I could not sleep because I knew people
> got hurt.  I was drunk.  That is why I shot in the air.  I got
> scared.  I'm so, so sorry.

(Id. at 648).[5]

After Patterson signed his statement, Det. Layne requested that the ESU search the Arcade again to determine whether a bullet was fired at the ceiling.  That renewed search failed to uncover any such evidence.  (Id. at 615-20, 627, 638, 651).

A firearms expert who examined the ballistics evidence found at the Arcade concluded that all of the recovered shell casings were fired from the same gun.  (Id. at 1652, 1673).  As the expert explained, the recovered bullets were too deformed to determine conclusively whether they also were fired by the same gun, although it was possible that they were.  (Id. at 1655-56, 1669, 1674).

4.    Prior Shooting

The People also presented evidence concerning another shooting involving Patterson and Williams six months before the shooting at the Arcade.  On August 1, 2002, Williams was confronted by members of the Edgemere Group as he went to a grocery store near Edgemere.  (Id. at 1509, 1514-15, 1608).  On his way home he again was confronted, this time by Addison and two accomplices wearing bandanas covering their faces (one of whom was Patterson).  Addison pointed a gun at Williams and pulled the

_____

[5]    Patterson apparently also recorded a videotaped statement, but a transcript of that statement is not part of the record before this Court.  (See id. at 652-53).

8

trigger twice, but the gun jammed.  Addison and his companions then fled to the house of

a nearby friend.  (Id. at 1517-20, 1531-32).

Accompanied by some friends from Ocean View, Williams went to the

house, pounded on the windows, and directed Addison and his companions to come

outside.  (Id. at 1521-22).  Patterson then emerged brandishing a semi-automatic pistol.

Patterson's bandana was around his neck so that Williams could see his face.  Patterson

fired several shots, one of which hit Williams in the back of his thigh.  (Id. at 1521-24,

1530).  Williams was hospitalized, but refused to cooperate with the police investigation

of the shooting.  Patterson consequently was not charged with any crime.  (Id. at 1614,

1616, 1619).

B.    Defense Case

As part of the defense case, Patterson called a forensic scientist, who opined

that the bullets found at the Arcade were fired by the same gun.  (Id. at 1866-67).

Patterson also called a detective who had interviewed Williams in the hospital after he

was shot.  The detective testified that the police form completed in connection with that

interview did not contain the words "braids" or "light-skinned."  (Id. at 1875-79, 1887).

The detectives who interviewed Green, Davis, and Santiago also testified

for the defense.  They confirmed that: (1) Green told officers that, although she saw a

man pulling something out of his waistband that she thought was a gun, she did not, in

fact, see a gun (id. at 1898-1901); (2) a police form completed by an officer after

interviewing Davis indicated that Davis described the gunman as Hispanic (id. at 1939-

41); and (3) Santiago told officers that he thought all of the shots came from one gun (id. at 1905).

    C.    <u>Verdict and Sentence</u>

On December 8, 2004, the jury returned a verdict of guilty on six counts of Assault in the First Degree; four counts of Gang Assault in the First Degree; two counts each of Assault in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree; and one count of Reckless Endangerment in the First Degree.  Patterson was acquitted on the remaining seven counts of Attempted Murder and two counts of Assault in the First Degree.  (Id. at 2193-2201).

On February 25, 2005, Justice Richard Carruthers, before whom the case was tried, sentenced Patterson to concurrent determinate prison terms, which in the aggregate amounted to a twenty-five year sentence.  (S. 31-34).

    D.    <u>Direct Appeal</u>

Before the Appellate Division, First Department, Patterson contended that (1) the evidence before the trial court was insufficient to support his conviction, (2) the court erred by admitting evidence of uncharged crimes, and (3) his sentence was excessive.  (<u>See</u> Ex. A).

On June 12, 2007, the Appellate Division unanimously affirmed Patterson's conviction.  <u>People v. Patterson</u>, 838 N.Y.S.2d 505 (1st Dep't 2007).  The Appellate Division found that the jury's verdict was supported by sufficient evidence, noting that,

10

"[a]lthough no witness could identify [Patterson] as firing shots, the evidence established

that [Patterson] was one of the persons doing so, and it refuted [Patterson]'s claim that

only [Justin] fired at the victims."  The court further observed that:

> Three impartial eyewitnesses described someone who
> resembled [Patterson], but not [Justin], as one of the
> assailants.  In addition, [Patterson] made a statement to the
> police admitting that he fired what he claimed to be a warning
> shot.  The eyewitness testimony, taken together with
> [Patterson]'s statement, provided strong circumstantial proof
> of [Patterson]'s guilt.

Id.

Turning to the uncharged crimes claim, the Appellate Division concluded

that the trial court had "properly exercised its discretion in receiving evidence that

[Patterson] shot one of the victims[6] six months before the incident at issue."  Id.  The

court further found that there was no reason to reduce Patterson's sentence.  Id.

By letter dated July 16, 2007, Patterson sought leave to appeal to the Court

of Appeals, (see Ex. E), which application was denied by Judge Carmen Ciparick on

September 26, 2007.  See People v. Patterson, 9 N.Y.3d 925 (2007).

E.    Habeas Petition

On February 5, 2009, Patterson timely filed his Petition.  (ECF No. 1; see

also Resp't's Mem. at 22 (conceding timeliness)).  In his Petition, Patterson contends that

the evidence presented at trial was legally insufficient to sustain the jury's verdict and that

---

[6]    The Appellate Division mistakenly identified Williams as "one of the victims."
He was not, in fact, among those injured at the Arcade.

11

the trial court erred by admitting evidence of uncharged crimes.  (Pet. ¶ 13).  On April 28, 2009, Judge Richard Holwell, to whom this case originally was assigned, referred the matter to me for a Report and Recommendation.  (ECF No. 3).

On October 22, 2009, I granted Patterson's request to hold the Petition in abeyance so that he could seek a Writ of Error Coram Nobis.  (ECF No. 11).  Subsequently, by letter dated October 14, 2010, Patterson requested that the Court proceed on the basis of his original Petition.[7]  (ECF No. 17).  The Respondent then timely filed his opposition papers on January 6, 2011.  (ECF Nos. 19-23).  In those papers, the Respondent concedes that Patterson properly exhausted his state court remedies with respect to his two original claims.  (Resp't's Mem. at 23); see 28 U.S.C. § 2254(b)(1)(A)-(B).

II.    Discussion

   A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the

───────────────

[7]    On April 30, 2012, the Court held a telephone conference, during which Patterson further acknowledged that he had abandoned his quest for a Writ of Error Coram Nobis and sought to pursue only the two claims set forth in his original Petition.  (See ECF No. 28).

12

evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir.

1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in Jones v. Stinson, the Supreme Court has

"construed the amended statute so as to give independent meaning to 'contrary [to]' and

'unreasonable.'"  229 F.3d 112, 119 (2d Cir. 2000).  "Under the 'contrary to' clause, a

federal habeas court may grant the writ if the state court arrives at a conclusion opposite

to that reached by [the Supreme] Court on a question of law or if the state court decides a

case differently than [the] Court has on a set of materially indistinguishable facts."

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application"

clause, a federal habeas court should "ask whether the state court's application of clearly

established federal law was objectively unreasonable."  Id. at 409.  This standard does not

require that reasonable jurists would all agree that the state court was wrong.  Id. at 409-

10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable

13

to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.      Sufficiency of Evidence

1.      Applicable Law

A federal court reviewing the sufficiency of the evidence underlying a state court criminal conviction must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318 (1979).  To prevail, the petitioner must show that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  Einaugler v. Sup. Ct. of the State of N.Y., 109 F.3d 836, 839 (2d Cir. 1997); Bossett v. Walker, 41 F.3d 825, 830 (2d Cir.

1994) (quoting Jackson, 443 U.S. at 324).  Moreover, in determining whether this

standard has been met, a habeas court must view the evidence in the light most favorable

to the prosecution and draw all permissible inferences in its favor.  Jackson, 443 U.S. at

319.  A petitioner challenging the sufficiency of the evidence therefore bears a "very

heavy burden."  Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).

      In determining the sufficiency of the evidence underlying a state court

conviction, a federal court "must look to state law to determine the elements of the

crime."  Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999); see Jackson, 443 U.S.

at 324 n.16; DiGuglielmo v. Smith, 366 F.3d 130, 137 (2d Cir. 2004).  In this case, the

applicable state law is the New York Penal Law ("PL").  As noted above, Patterson was

convicted on four counts of intentional first-degree assault arising out of the injuries to

Dawodu, Gonzalez, Green, and Branch.  To establish his guilt on each of those counts,

the People must have proved that, "[w]ith intent to cause serious physical injury to

another person, he cause[d] such injury to such person or to a third person by means of a

deadly weapon or a dangerous instrument."  PL § 120.10(1).  Additionally, to be guilty of

first-degree gang assault with respect to these victims, Patterson must have been "aided

by two or more other persons actually present" while intentionally causing serious

physical injury to another person.  Id. § 120.07.

      Patterson also was convicted on charges of first-degree assault with respect

to Lewis and Wannamaker on a depraved indifference theory.  For him to be guilty of

those counts, the People must have proved that, "[u]nder circumstances evincing a

depraved indifference to human life, he recklessly engage[d] in conduct which create[d] a grave risk of death to another person, and thereby cause[d] serious physical injury to another person." Id. § 120.10(3).

Finally, Patterson was convicted of second-degree assault with respect to Callist and Santiago. To prove Patterson's guilt on these counts, the People must have demonstrated that, "[w]ith intent to cause physical injury to another person, he cause[d] such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." Id. § 120.05(2).[8]

As Justice Carruthers instructed the jury, it was not necessary that Patterson directly have caused harm to each of the Arcade victims. (See T. 2122-24). Rather, Patterson also could be found guilty of any of the above crimes as an accessory if he (a) acted with the required mental culpability, and (b) solicited, requested, commanded, importuned, or intentionally aided another person in committing the crime. Id. § 20.00.

2.     Application of Law to Facts

Contrary to Patterson's claim, the People unquestionably produced evidence sufficient to find Patterson guilty on all of the counts as to which the jury returned a guilty verdict. Indeed, three impartial witnesses testified that, moments after

_____

[8]     On appeal, Patterson challenged the sufficiency of the evidence regarding the assault charges, but not the weapons possession and endangerment charges. (See Ex. A at 32-39). Any challenge to the sufficiency of the evidence relating to the remaining counts consequently is unexhausted. In any event, even if Patterson were able to seek habeas relief with respect to those counts, his admission that he fired a loaded pistol in a crowded dance area plainly would have been sufficient evidence for the jury to have convicted him. See PL §§ 265.02, 265.03, 120.25.

they heard shots fired, they saw a man with a hairstyle similar to Patterson's hairstyle who was holding a gun in his left hand.  (See T. 1143-46, 1149, 1157, 1689-92, 1784-87, 1800-07).  No other member of the Edgemere Group wore his hair in a similar style, (id. at 379-87), and Justin – the only other accused shooter – was right-handed.  (Id. at 368-69).

Based on this evidence, a reasonable juror could have concluded that Patterson intentionally shot Dawodu, Gonzalez, Green, Branch, Callist, and Santiago, causing each of them the requisite degree of physical injury,[9] and, with a depraved indifference to human life, similarly shot and injured Lewis and Wannamaker.  Alternatively, the jurors reasonably could have concluded that Justin had committed some or all of the above crimes,  and Patterson had solicited, requested, commanded, importuned, or intentionally aided Justin in the their commission.

While the eye-witness testimony alone was sufficient to convict, Patterson also admitted in his written statement that he had brandished a gun and fired it in the Arcade.  Although Patterson contended that he fired only a single warning shot at the ceiling, a rational juror certainly could have concluded that Patterson actually shot at Williams or other members of the Ocean View Group with the intent to cause them

---

[9]    It bears noting that the jury did not have to find that Patterson intended to shoot all six victims.  Rather, in order to convict, a reasonable juror need only have found that Patterson intended to shoot and cause injury to one of the those victims, and actually caused an injury to each of them.  See PL §§ 120.05(2), 120.10(1).  Here, there is ample evidence upon which the jurors could make that finding.

17

serious physical injury, particularly in light of the evidence of Patterson's prior shooting of Williams.

In sum, as the Appellate Division correctly concluded, "the eyewitness testimony, taken together with [Patterson]'s statement, provided strong circumstantial proof of Patterson's guilt." Patterson, 838 N.Y.S.2d at 505.[10]  Patterson's claim that the evidence presented at trial was legally insufficient to sustain the jury's verdict consequently should be denied.

C.     Uncharged Crime Evidence

Patterson further contends that the trial court erred by admitting evidence that he shot Williams in August 2002.  (See Pet. ¶ 13).  Under both federal and New York law, evidence of prior crimes may not be admitted solely to show that a defendant has a propensity for criminal activity.  See Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); People v. Rojas, 97 N.Y.2d 32, 36 (2001) ("[A] criminal case should be tried on the facts and not on the basis of a defendant's propensity to commit the crime charged.").  On the other hand, both jurisdictions permit uncharged crimes evidence to be introduced when it is relevant to an issue other than criminal propensity.  See Fed. R. Evid. 404(b)(2) ("This

_____

[10]     The evidence also clearly would permit a rational juror to conclude that Patterson was "aided by two or more other persons actually present" in committing these assaults.  See PL § 120.07.

evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) ("Rule 404(b) does not bar all other crime evidence; it bars only the admission of a defendant's uncharged crimes to prove propensity to commit the crime charged.") (internal quotation marks omitted); People v. Allweiss, 48 N.Y.2d 40, 47 (1979) ("When evidence of uncharged crimes is relevant to some issue other than the defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will outweigh the potential prejudice to the accused."); People v. Molineux, 168 N.Y. 264, 293 (1901) (describing the so-called "MIMIC" exceptions to the proscription against the use of other crimes evidence); see also Rojas, 97 N.Y.2d at 37-38 (the Molineaux exceptions are illustrative, not exhaustive, and a jury may consider defendant's prior crimes as bearing on credibility).

Here, as the Appellate Division correctly observed, the evidence concerning the prior shooting was properly admitted because it established Patterson's "intent, which his statement had placed at issue, . . . and tended to refute the version of the incident contained in [his] statement." Patterson, 838 N.Y.S.2d at 505 (internal citations omitted). Moreover, the trial court acted well within its discretion in finding that the probative value of that evidence outweighed its prejudicial effect, and appropriately minimized any resulting prejudice through limiting instructions. See id.

In any event, even if the evidence of Patterson's prior crime was admitted for an arguably improper purpose, the Supreme Court has expressly declined to resolve whether the use of "prior crimes or bad acts" to show criminal propensity violates Due Process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991).  "Thus, since the Supreme Court has taken no position on the issue, it would be impossible for [a district court] to make the determination required under § 2254(d), namely that the state court decision violated 'clearly established Federal law as determined by the Supreme Court of the United States.'"  Roberts v. Phillips, 03-CV-2957 (NGG), 2004 WL 502920, at *3 (E.D.N.Y. Feb. 2, 2004); see Allaway v. McGinnis, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) ("[T]he Supreme Court has not yet clearly established when the admission of evidence of prior crimes under state evidentiary laws can constitute a federal due process violation.") (citing Estelle, 502 U.S. at 67-68).

Patterson's claim relating to the admission of evidence concerning uncharged crimes consequently should be denied.

## III.   Conclusion

For the foregoing reasons, the Petition should be denied.  Furthermore, because Patterson has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

IV.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (e).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jesse M. Furman, United States District Judge, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Furman.  The failure to file timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

SO ORDERED.

Dated:      New York, New York
            July 3, 2012

                                        FRANK MAAS
                                  United States Magistrate Judge

Copies to:

Hon. Jesse M. Furman
United States District Judge

Bryant Patterson
05-A-1258
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York, 12929

Leilani Rodriguez
Assistant Attorney General
120 Broadway
New York, New York 10271
(212) 416-8010        (fax)